DICKINSON v. McKENZIE.

4-5405                                    126 S. W. 2d. 95

Opinion delivered March 13, 1939.

*W. R. Thrasher* and *G. R. Haynie,* for appellant.

*H. H. McKenzie* and *McRae & Tompkins,* for appellee.

Holt, J. Appellant, Layman Dickinson, and appellee, H. H. McKenzie, on September 12, 1936, entered into a written agreement under the terms of which appellee agreed to sell to appellant 538.08 acres of land in Nevada county, Arkansas, for $3 per acre, reserving all pine timber eight inches and over at the stump. $200 was paid as earnest money and the balance was to be paid on or before January 10, 1937. On January 9, 1937, appellee executed a deed to appellant in compliance with the agreement, reserving therein the pine timber with the right, for one year, from the date of the deed, to cut and remove said timber. In June, 1937, it became apparent that the timber could not be removed within the time limit, so on June 19, 1937, an option was agreed to and signed by appellant giving appellee a year's extension from January 9, 1938, to January 9, 1939.

The material provisions of this option are as follows: "I give and grant to the said H. H. McKenzie the option

of extending the time for another year from January 9, 1938, on payment to me of $100 at any time on or before January 9, 1938, should he care to exercise the option, and on payment to me of the $100 in cash at any time on or before January 9, 1938, the said H. H. McKenzie shall have until January 9, 1939, to cut and remove said timber." After January 9, 1938, appellant contended that appellee had failed to pay or tender to him the $100 for appellee's right to the extension in question according to the terms of the option agreement, and accordingly declared appellee's right to the option forfeited, and thereafter refused to accept the $100 tendered by appellee for said extension.

Thereupon appellee filed this suit, alleging in his complaint, among other things, the following: "That prior to the 10th day of January, 1938, plaintiff had prepared the necessary papers and a valid check for the $100 payable to defendant and sought to deliver same to him, but by various pretenses said defendant evaded plaintiff, but agreed that he would meet plaintiff on Saturday, the 15th day of January, 1938, and close said contract, thereby lulling plaintiff into the belief that he would accept said tender and execute said extension. That on said day plaintiff tendered said sum to defendant, but he refused to accept same, and claimed the time to make same had expired. That plaintiff was at all times on and after the 9th day of January, 1938, and is now, ready, able and willing to pay said $100, and sought to do so, but was wrongfully prevented from doing so by defendant wrongfully evading plaintiff and absenting himself for the fraudulent purpose of claiming that said option had expired. That defendant is now estopped to claim that said option has expired."

Appellee also tendered into court the sum of $100 and prayed that appellant be required to specifically perform said option, that he be enjoined and restrained from cutting and removing any part of the timber specified, and that he, appellee, be given one year from the termination of the litigation in which to cut and remove said timber. Appellant filed a demurrer and answer to the complaint. In his answer he specifically

denied every material allegation in the complaint except that he admitted the execution of the contract of September 12, 1936, the execution of the deed in question by appellee on January 9, 1937, and the execution of the option agreement dated June 19, 1937, signed by appellant only.

The material facts, as reflected by the record, substantially are: January 9, 1938, fell on a Sunday. Appellant is a traveling salesman and was usually out of the city except at night. On January 7, 1938, appellee prepared the option extension agreement in question, but did not see appellant that day but on Sunday night, the 9th, at about seven o'clock, he called appellant on the 'phone and told him that he had missed him on the Saturday before and that he then had the papers and check ready to close the extension and that appellant replied to him over the telephone in these words: "Why, Horace, don't worry, this is Sunday and it is not convenient. I will be here all next week and we can attend to it next week." On Monday, January 10, 1938, appellee called several times at the office of the Logan Grocery Company, where appellant worked, but each time was advised that appellant had not returned from his territory, and subsequently 'phoned for appellant three times and finally talked to him over the 'phone and told him that he, appellee, had the $100 ready and papers to be signed by appellant. Appellant advised appellee that he was tired, having worked his orders, and "Don't worry, Horace, we will fix that up Saturday." The record further reflects that on Saturday, January 15th, appellee met appellant on the street about 11:30 a.m. and told him he would like to get the papers signed and that he would get Miss Hitt, a notary, and go out to appellant's house to get his wife's signature. Appellant advised against this, saying that he might not be at home. Appellee met appellant two or three times the same afternoon and on their last meeting appellant said to him: "The mails were open, you could have sent me the check. You did not pay it in time and I feel that it is my timber." Appellant testified that appellee did not tell him that he had

a check for him for $100; that money was never mentioned from June 19, 1937, until January 15, 1938.

He further testified that appellee never told him in the conversations he had with him that he wanted to get the extension closed up; that he, appellant, did not know what appellee wanted with him; that he did not say except that he had some papers he wanted to fix up; that he said nothing to mislead appellee or to keep him from paying the $100.

Gus McCaskill testified that he was in the Logan Grocery Company building on January 10th when appellee talked to appellant on the 'phone and that he heard appellant's part of the conversation distinctly, he not being more than thirty feet away. He heard appellant say, "Horace, (meaning appellee) don't worry about that I will attend to that Saturday." Appellant denied that he made any such statement over the 'phone.

Sam Logan testified that he is connected with the Logan Grocery Company, and that appellant had been employed by the company for nineteen years. Appellee, on the afternoon of January 10, 1938, made several 'phone calls to the grocery company inquiring if appellant were in the office. He, Logan, answered the 'phone once. Appellee asked if appellant were there and that he told him he had not come in but should be there in a few minutes. Appellee is Logan's wife's nephew. Appellee further testified that he went by to see if appellant had come in for he was anxious to get it closed up that day. That was the date of the expiration of the option. He did not go to appellant's house that night because appellant refused to see him. Appellant put the date off and set the date himself as to when he would close it. Appellee further testified that if he had known appellant was trying to defraud him and would not sign the extension he would have sent it by registered mail, and told appellant when asked why he did not mail it to him, that with our relationship and the trust appellant had in him, appellant would think appellee a plain fool if he registered a letter with a $100 money order in it to him. Appellee thought he should have closed the deal that day. There is other evidence in the case, which we do not deem it necessary to set out.

On this record the court, among other things, found as follows: ''The court further finds that prior to the 10th day of January, 1938, the plaintiff had prepared the necessary papers and a valid check for $100, payable to the defendant, Layman Dickinson, and sought to deliver the same to him but by various pretenses evaded plaintiff but agreed that he would meet the plaintiff on Saturday the 15th day of January, 1938, and close said contract, thereby lulling the plaintiff into the belief that he would accept said tender and execute said extension. That on said day the plaintiff tendered said sum to defendant, Layman Dickinson, but he refused to accept said tender and claimed the time to make the same had expired. The court further finds that plaintiff was at all times on and after the 9th day of January, 1938, and is now ready, able and willing to pay said $100, and sought to do so, but was wrongfully prevented from doing so by defendant, Layman Dickinson, wrongfully evading plaintiff and absenting himself for the fraudulent purpose of claiming that said option had expired; that defendant is now estopped to claim that said option has expired;'' that appellee had paid the sum of $100 into the registry of the court for appellant, that appellee is entitled to judgment and decreed that appellee have one year from the date the judgment became final to cut and remove the pine timber in question, that the clerk of the court pay the $100 in the registry of the court to appellant, and that appellant be permanently enjoined and restrained for the period of one year from interfering with appellee in cutting and removing said timber. From this judgment of the trial court comes this appeal.

It is earnestly contended by appellant that the chancery court had no jurisdiction and that its judgment awarding specific performance and injunctive relief is erroneous. To this contention we cannot agree. It will be remembered that the consideration mentioned in the deed executed on January 9, 1937, for the 538.08 acres of land in question was $3 per acre and in addition the reservation to the appellee, McKenzie, of all the eight inch, or over, pine timber of the approximate value of $2,000, provided the timber were removed within a year from

the date of the deed, and that the option agreement of June 19, 1937, was but an agreement upon the payment by appellee to appellant of $100 additional on or before January 9, 1938, to give appellee a year's additional time from January 9, 1938, within which to cut and remove the timber.

We hold that equity had jurisdiction to enforce specific performance of the contract in question and to grant the injunctive relief prayed for. In *Dollar* v. *Knight*, 145 Ark. 522, 224 S. W. 983, this court states the rule as follows: "Where land or any estate or interest in land is the subject-matter of the agreement, the jurisdiction to enforce specific performance is undisputed, and does not depend upon the inadequacy of the legal remedy in the particular case. It is as much a matter of course for courts of equity to decree a specific performance of a contract for the conveyance of real estate, which is in its nature unobjectionable, as it is for courts of law to give damages for its breach." And in 25 R. C. L., p. 271, § 72, the author says: "In the case of real estate specific performance is decreed almost as a matter of course when the contract has been properly established and is unobjectionable in any of its features which address themselves to the chancellor's discretion. Under such circumstances the vendee is entitled to have the contract specifically enforced irrespective of his right to recover damages for its breach. In other words, where the land is the subject-matter of the agreement, the jurisdiction of equity does not depend upon the existence of special facts showing the inadequacy of a legal remedy in the particular case, but the presumption arises that damages will not constitute an adequate remedy. Damages are not regarded as the equivalent of the specific relief because the exact counterpart of any particular piece of real estate does not exist anywhere else in the world."

The contract in the instant case need not be binding upon both appellant and appellee. It being an option contract, it is sufficient if it is binding upon appellant alone and may be specifically enforced as to him. In *Meyer* v. *Jenkins,* 80 Ark. 209, 96 S. W. 991, this court said: "It is true that Jenkins does not agree to pur-

chase; that was left optionary with him. He had, under the contract, which is set out in the statement of facts, the right to purchase at the expiration of his lease, if he chose to do so. A contract of that kind which by its terms is binding on one of the parties only may be specifically enforced against that party, although the remedy cannot be granted to him against the other party. Pomeroy, Specific Performance, § 169; Waterman on Specific Performance, § 200.''

Also in *Watts* v. *Kellar*, 56 Fed., 1, on the question as to whether or not a contract will be specifically enforced where the right to specific enforcement is not mutual, the court said: ''The want of mutuality of right to a specific performance of a contract, which sometimes precludes its enforcement in equity, has no application to an option contract of the character we are considering. The purchaser of an option to buy or sell land pays for the privilege of his election. It is that very privilege which the other party to the contract sells. In the absence of an agreement to the contrary, each party to a contract to buy or sell land may have it specifically enforced against the other, but the very purpose of an optional contract of this nature is to extinguish this mutuality of right, and vest in one of the parties the privilege of determining whether the contract shall be vitalized and enforced. An option to buy or sell land, more than any other form of contract, contemplates a specific performance of its terms; and it is the right to have them specifically enforced that imparts to them their usefulness and value. An option to buy or sell a town lot may be valuable when the party can have the contract specifically enforced, but, if he cannot do this, and must resort to an action at law for damages, his option in most cases will be of little or no value. No man of any experience in the law would esteem an option on a lawsuit for an uncertain measure of damages as of any value. The modern, and we think the sound, doctrine is that when such contracts are free from fraud, and are made upon a sufficient consideration, they impose upon the makers an obligation to perform them specifically, which equity will enforce.''

It is next contended by appellant that the chancellor's decision is against the weight of the evidence. We cannot agree. After a careful consideration of this entire record, we have reached the conclusion that the findings of the chancellor are not against a preponderance of the evidence, and that the evidence supports appellee's contention that he was ready, able and willing to carry out the terms of the option agreement in question and did all that was required of him in attempting to pay to appellant the $100 for the extension of time before January 9, 1938, and that he was prevented from doing so solely by the conduct of appellant. In *Townes* v. *Oklahoma Mill Company*, 85 Ark. 596, 109 S. W. 548, this court said: "It is an elementary principle, needing no citation of authority in support, that there is no breach of contract where performance is prevented by the conduct of the other party. The party whose own conduct prevents performance of a contract cannot complain of non-performance."

In James on Option Contracts, § 923, p. 455, the author says: "If the failure to make a timely election arises from the inequitable conduct of the optioner, and the optionee is free from fault, equity disregards time as essential * * *. The effect of such conduct, it is said, waives the timeliness of the tender and estops the optionor from taking advantage of his own wrongful conduct." Again this court in *Kampman* v. *Kampman*, 98 Ark. 328, 135 S. W. 935, said: "Now, as we have already said, conditions which operate as a forfeiture of rights under a deed are not favored in the law, and slight circumstances will often be seized upon to prevent such forfeitures. Any conduct on the part of the party having the right to declare a forfeiture which is calculated to induce the other party to believe that the forfeiture is not to be insisted on will be treated as a waiver. As said by Judge RIDDICK in *Bain* v. *Parker*, 77 Ark. 168, 90 S. W. 1000, 'a condition may be waived by acts as well as by express release.'"

On the whole record we conclude that the findings of the chancellor are correct, and the decree is accordingly affirmed.